# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

|  | | |
|---|---|---|
| KATIE KING, | : | Civil No. 1:09-CV-30 |
| Plaintiff, | : | |
| | : | Judge Clark Waddoups |
| vs. | : | |
| SHAWN WALTON, | : | Report of Kenneth R. Wallentine |
| Defendant. | : | |
| | : | |

The following report of Kenneth R. Wallentine is submitted after review of the following

documents, pleadings, records, and reports:

Police reports from Layton City Police Officer Shawn Walton and Animal Control Officer

Brandie Stanley;

Sworn depositions of Officer Shawn Walton and Katie King including depositions

exhibits;

Transcribed police car video recording and a copy of the video recording of this incident;

Statement provided by Chris Polly;

Transcriptions of interviews between Lyle Kunz and Shawn Horton and Lyle Kunz and

Brandie Stanley;

Pleadings, including the Complaint and Answer, Defendants' Initial Disclosures,

Defendants' Responses to Plaintiff's First Set of Discovery & Requests for Admission,

Plaintiff's Responses to Defendants' First Set of Discovery: Admission, Interrogatories

and Requests for Production of Documents; and,

Photographs identified as showing Katie King.

In the instant matter, I have relied upon the documents, diagrams, pleadings, records,

reports, and statements previously described. I have formed a number of opinions based upon the

aforementioned, as well as my experience, education, and familiarity with professional

publications. I have relied on a variety of professional publications, including, but not limited to,

my own publications and court decisions cited therein. Those opinions, and a summary of the

circumstances known or reported to me upon which those opinions are based, are set forth herein

as follows:

1.    **Officer Walton's arrest of Katie King was consistent with generally accepted police practice and was reasonable.**

      a.      Police officers are commonly called to assist other public safety workers in the capacity to keep the peace and/or to provide additional assistance as other public safety workers enforce city and county codes, enforce animal control codes and/or for the service of summons and complaints and other legal process. A police officer would commonly be called to assist an animal control officer sent to enforce animal control laws where the animal control officer had already dealt with the violator and had issued prior notices of violation, and particularly when the offending animals are pit bull breeds. These dogs are commonly associated with

unprovoked aggressive violence. It is also common for drug users and sellers to have pets such as various pit bulls and bull terriers breeds.

b.      On April 13, 2008, Officer Walton was assigned to assist Animal Control Officer Brandie Stanley as she dealt with a citizen's complaint of two aggressive pit bulls running at large in a residential neighborhood. The citizen complainant, Chris Polly, told Officer Walton and Officer Stanley that the dogs were often running at large in the neighborhood. Officer Stanley told Officer Walton that she had personally dealt with these dogs and had issued a citation for a violation involving the dogs in the recent past. She also told Officer Walton that a person living in the home with the dogs was arrested by other Layton City Police officers on her prior visit to deal with the dogs.

c.      As Officer Walton spoke with Officer Stanley, Katie King approached them. Katie King identified herself to the officers as the owner of the pit bulls. Ms. King was speaking to someone else on a telephone. Once she identified herself as the owner of the pit bulls, it was incumbent upon Officer Walton and Officer Stanley to gather information for a citation and for a police report to document their action in response to the citizen's complaint. A reasonable officer would issue a citation or effect a custodial arrest in these circumstances. Officer Walton asked Ms. King for her name several times. Though she was standing near him and could apparently hear him, Ms. King ignored Officer Walton's initial requests. She eventually provided her name in a very rapid, clipped tone, and immediately continued with her phone conversation. Officer Walton tried to reason with Ms. King and asked her to end her phone conversation. She refused. Officer Walton then ordered Ms.

King to end her phone conversation so that he and Officer Stanley could complete their investigation. This is consistent with the training and practice of a reasonable police officer.

d.  It can be very dangerous for a suspect to make a telephone call or other electronic communication during an active investigation, particularly an investigation into a volatile situation. Mr. Polly was apparently very much aggravated by the pit bulls coming onto his property and he had threatened to shoot the dogs. An officer dealing with a person talking on the telephone cannot know whether the person is calling confederates to assist him or her in assaulting the police or to facilitate an escape from the officer. Even seemingly innocent conversation may contain hints or prearranged signals for confederates to aid in illegal action against the officer. The need for the officer to maintain control of communications during the investigation is even greater when the officer is dealing with a hostile and aggressive suspect or a hostile situation, such as a confrontation between neighbors that stems from aggressive and potentially very dangerous dogs running loose. A reasonable officer would be very concerned that a person had been arrested on a previous similar call at this same address, a call also prompted by these pit bulls running loose in the neighborhood. A reasonable officer would have instructed Ms. King to end the phone call.

e.  As Officer Walton tried to persuade Ms. King to cooperate with the investigation, she provided some information to the officers in rapid speech. The officers were not able to make any real progress, as Ms. King's answers were marginally cooperative and responsive, at best. Ms. King decided to walk away from the

officers as they were attempting to obtain the necessary answers to complete a citation and reports. She turned and started toward the house with no explanation, abruptly ending her minimal cooperation with the investigation. A reasonable officer would not have allowed Ms. King to go into the house at that point. To allow such would be inconsistent with sound and basic police training and practice.

f.   A reasonable police officer would recognize the significant danger in allowing Ms. King to enter the house at that point without any understanding of her intent or purpose, without any knowledge of who might be in the house, and without any escort into the house. Officer Walton knew that there were at least two aggressive and potentially dangerous pit bulls in the house. Officer Walton knew that Ms. King had been talking to someone else, potentially someone in the home. A reasonable officer would have been concerned that Ms. King was taking cover in the house so that the officers could be assaulted by other persons in the home or possibly traveling to the scene after being alerted by Ms. King's phone call. A reasonable officer would have been concerned that Ms. King would unleash the pit bulls to attack the officers. In either case, Officer Walton could well have been in the untenable circumstance of using significant force to defend himself. He might potentially be forced to shoot the dogs. No reasonable officer would have allowed Ms. King to frustrate the investigation by walking away into a house at that point where she could become a significant danger to the officers. Police training is universally very clear and consistent on this point.

g.   A reasonable officer would understand from police training and practice that Ms. King was legally obliged to cooperate with the investigation into the allegation that

she allowed her pit bulls to run unleashed in the neighborhood. At the Utah Police Academy, officers are taught that interfering with a public officer who is lawfully executing his or her duty is a crime. Officers are also taught that it is a crime for a person to stop at the command of a law enforcement officer when the officer has issued a verbal or visual command to stop. A reasonable officer would understand that there was probable cause to arrest Ms. King for the animal control violation and probable cause to arrest Ms. King for interfering with a public servant at the point at which she failed to comply with a lawful order and for failure to stop at the command of a law enforcement officer when she was directed to not go into the house. A reasonable officer would also understand that there was reasonable suspicion to detain Ms. King for investigation of the animal control violation and reasonable suspicion to detain to arrest Ms. King for investigation of interfering with a public servant at the point at which she failed to comply with a lawful order and for failure to stop at the command of a law enforcement officer when she was directed to not go into the house. Officer Walton's actions in attempting to gain information from Ms. King, in commanding her to end the phone call, in attempting to detain her and in arresting her were consistent with those of a reasonable officer and were consistent with police training.

2. **Officer Walton used reasonable force to effect the arrest of Katie King.**

   a. When Ms. King's actions necessitated force to stop her from going into the house and to end the phone call, Officer Walton applied an empty-hand grip technique that is consistent with police training and that was a reasonable response to Ms. King's unlawful actions. As Ms. King continued her unlawful actions, Officer

Walton pushed her off balance so that he could gently lower her to the ground. Officers are taught that moving a resisting or combative person to the ground is often one of the best practices to gain control of the person with minimal injury to the person and to the officer.

b.    Though the physical action cannot be seen on the recording, the evidence shows that Officer Walton carefully pushed Ms. King to the ground in a fashion that was not intended to, and did not, cause injuries to her. She suffered some very minor abrasions due to her wriggling on the ground and her forcible resistence to Officer Walton's efforts to control and handcuff her. A reasonable officer would place handcuffs onto a resistive person as quickly as possible. Officer Walton's force to bring Ms. King under control and arrest her was consistent with police training and was reasonable.

c.    It is remarkable that the audio-video recording of the incident clearly shows that Officer Walton used a calm and professional demeanor and pleasant tone of voice during the entire event. Even as he was attempting to persuade Ms. King to cooperate, his tone is friendly. His tone and conduct is friendly and non-aggressive with Ms. King even after she has attempted to walk back into the house and is taken into custody. His entire comportment was that of a reasonable and well-trained police officer.

3.    In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career. My qualifications, publications, litigation history and fee schedule are recited herein.

4.     I am a law enforcement officer in the State of Utah. My primary employment is for the

Utah Attorney General, where I serve as Chief of Law Enforcement. I was formerly employed as

a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training

Division, where I supervised investigations into allegations of improper and excessive force,

officer integrity, and criminal acts alleged to have been committed by law enforcement officers

and supervised in-service training administration and certification for all peace officers in the State

of Utah, and supervised the police service dog training and certification program. I also had

responsibility for policy drafting and review for the parent agency, the Utah Department of Public

Safety. I was certified as a law enforcement officer in the State of Utah in 1982. My duties

include direct supervision and command of three Investigation Sections, supervising

approximately thirty-five law enforcement officers, forensic specialists, and technicians, as well as

a number of other employees. I command the State of Utah Child Abduction Response Team. I

command the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the

Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and

complex violent person crimes investigations. In 2010, Governor Gary Herbert selected me for

the annual Governor's Award for Outstanding Public Service.

5.     I was formerly responsible for providing delivery of the Basic Training Curriculum related

to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I

continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy

curriculum currently in use for several subjects, including, but not limited to, use of force,

reasonable force, use of force and police service dog teams, search and seizure, search and seizure

for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the

Basic Training programs of the Utah State Police Academy. I regularly teach in the following

specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for the POST Police Service Dog program. I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms courses. I am a certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor.

6.      I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as immediate past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I am an adjunct Professor of Law at Brigham Young University, teaching Criminal Procedure and supervising directed research. I am on the adjunct faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety and am responsible for course design and curriculum selection for Criminal Procedure.

7.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the

requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I am a program and grant reviewer for the Office of Justice Programs, United States Department of Justice. I have also served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

8. I participate and serve in a number of community and professional capacities. I am a member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. Other professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of

Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-Chairman of the Utah Law Enforcement Legislative Committee. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I currently frequently serve as a member *pro tempore* of the Council on Peace Officer Standards and Training.

9.      Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction.

10.      I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officer's Legal Handbook*, was published by Lexis/Nexis Matthew Bender in December 2008. It includes an extensive discussion of use of force by police officers. Another recent book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers. My other published works, limited to the past ten years, include: *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, January 2010; *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the*

*Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009;

*Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog*

*Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police

K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An*

*Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9,

December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections

Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press

2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-*

*Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*,

Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating*

*In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk*

*Management*, The Municipal Lawyer, July 2002; *The New Paradigm of Firearms Training*,

IADLEST News, Spring 2001; *Use of Deadly Force Instructor Curriculum* (monograph), POST,

Spring 2001; *Pepper Spray as Use of Force*, Police, October 2000; *Are Drug Courts the Wave of*

*the Future?*, Police, April 2000; *Legal Risks of Tactical Operation*, Police, April 1999; and a

variety of columns addressing law enforcement issues and published by PoliceOne.com. I am the

author of a reference book currently in use in the Utah Law Enforcement Academy, as well as

other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's*

*Guide* (Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and

search and seizure of persons and property, among other subjects.

11.     I charge a fee for private consultation services and court testimony. For those matters

which progress beyond an initial brief consultation, I charge $200.00 per hour for all activities

outside of court and deposition testimony, a travel fee of $1,000.00 per day, plus actual expenses,

for travel to western states and $1,500.00 per day for all other states, and $250.00 per hour when offering court and deposition testimony. I have testified and/or provided depositions in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Al-Asadi v. City of Phoenix*, Case No.2:09-CV--00047-PHX-DGC, United States District Court of Arizona, 2010. Deposition testimony given on behalf of defendants. Subject matter: excessive force. *United States v. Beltran-Palafox*, Case No. 09-40022-01/02 JAR, United States District Court of Kansas, 2010. Court testimony given on behalf of the prosecution. Subject matter: improper training and whether a drug detector dog was reliable and whether the dog was cued. *United States v. Trestyn & Herren*, No. 09-CR-00216-B, United States District Court of Wyoming, 2010. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *United States v. Ludwig*, No. 08-CR-00224-D, United States District Court of Wyoming, 2009. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper execution of search warrant, negligent investigation. *Swofford v. Eslinger*, Case No. 6:08-CV-00066-PCF-DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper search and excessive force. *Becker v. Bateman*, Case No. 2:07-CV-311 PGC, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: excessive force. *Salva v. Kansas City Board of Police Commissioners*, Case No. 07-CV00194-JTM, United States District Court of Missouri, Western Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: Wrongful death. *Turnbow v. Ogden City et al.*, Case No. 1:07-CV-114, United States District

Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: Wrongful death. *Nielson v. South Salt Lake City & Burnham*, Case No. 2:06-CV-335, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: sexual misconduct. *Trammell v. Jacksonville Beach City Police Department*, Case No. 3:06-CV-984-J-16MMH, United States District Court of Florida, Jacksonville Division, 2008. Deposition testimony given on behalf of the plaintiffs. Subject matter: excessive force. *Harman & Overton v. Utah Department of Public Safety,* Case No. 2:03CV00558TC, United States District Court of Utah, Central Division, 2007. Deposition testimony given on behalf of the defendants. Subject matter: wrongful search, negligent investigation. *Herring v. City of Colorado Springs*, Civil No. 04-CV-024229-PAC-BNB, United States District Court of Colorado, 2005. Deposition testimony given on behalf of the defendants. Subject matter: excessive use of force, wrongful death.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, and further investigation. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

Officer Shawn Walton acted reasonably in arresting Katie King. His actions were consistent with police training and generally-accepted police practices. The force that Officer Walton used to detain and arrest Katie King was reasonable.

Kenneth R. Wallentine
May 13, 2010

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123