IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| KATIE KING, <br><br> Plaintiff, <br><br> v. <br><br> SHAWN WALTON, a Layton City Police Officer, *et al.*, <br><br> Defendants. | ORDER and MEMORANDUM DECISION <br><br><br> Case No. 1:09-cv-30 CW |

In this action, Plaintiff Katie King alleges that Defendant Shawn Walton violated her civil rights. Officer Walton, a Layton City police officer, twice grabbed Ms. King's arm, took Ms. King to the ground and handcuffed her during an investigation. Officer Walton contends that he acted reasonably in taking these actions, while Ms. King contends that Officer Walton used excessive force. Now before the court is Officer Walton's motion for summary judgment based on qualified immunity. For the reasons below, his motion is GRANTED.

## BACKGROUND

In April 2008, Ms. King was the licensed owner of two dogs. The dogs were of breeds that are commonly referred to as pit bull. She and a roommate kept the dogs at their home in a trailer park in Layton, Utah. On April 15, 2008, Layton police received a complaint of Ms. King's dogs running loose in the park and entering a neighbor's property. Brandie Stanley, an

animal control officer, and Officer Walton went in separate vehicles to the trailer park to respond.

When Officer Walton first arrived in front of Ms. King's home, he began to speak to Officer Stanley about the situation.[1]  Officer Stanley said that about a month earlier, she had been to the home on a call about the dogs.  She said that a police officer who had accompanied her to the home had arrested a man there after running his license and finding a warrant for him.  Officer Walton asked Officer Stanley if he was "kind of a bad guy," to which Officer Stanley replied affirmatively.  Officer Stanley then said that she planned to ticket the owner, who she implied was the same man who had been arrested earlier.  During this conversation, the officers were standing on the street immediately outside Ms. King's home.

Ms. King's neighbor, who had called to report the dogs running loose, then walked up to the officers, who were still standing on the street outside Ms. King's home.  Officer Stanley commented that she had been to Ms. King's home numerous times regarding the dogs.  The neighbor was infuriated and said that the dogs were often on his property.  The neighbor said that he felt that the dogs were a threat to his family and other people in the community.  He said that on that afternoon, the dogs were standing on his porch and had acted aggressively to him, his wife and his child.  The neighbor explained to the officers that after ensuring that his family was safe, the neighbor told a man in Ms. King's home that if the dogs went onto his property again, that he (the neighbor) would shoot the dogs.  The neighbor told the officers that the man had taken the dogs back into Ms. King's home about five minutes before the neighbor called the police.

---

[1] The court has included facts in this section obtained from Officer Walton's dashcam recording of the incident, the authenticity of which is not in question.

Immediately after the officers finished speaking to Ms. King's neighbor, Ms. King walked up to the officers. As she approached them, she was on her cell phone. Officer Stanley greeted Ms. King and asked if she was the dog's owner, to which Ms. King said no. When Officer Stanley asked Ms. King to bring the owner out to speak to them, Ms. King said "He's not here right now." When Officer Stanley asked if Ms. King was the only person in the home, she responded that her boyfriend owned dogs, but that the dogs were in her name. When Officer Stanley asked Ms. King for her driver's license, Ms. King did not audibly respond, but went back into home. As Ms. King was in the home, Officer Walton asked Officer Stanley if the owner was "a younger guy." Officer Walton asked Officer Stanley if she had cited "him" before, and Officer Stanley stated that it would be "his" third time being cited. During this time, the officers moved a few feet over from the street to stand on the sidewalk beside Officer Stanley's vehicle, which was parked outside the path to Ms. King's home.

At that point, Ms. King came back out of her home to speak to the officers, still talking on her cell phone. She explained to the officers that she did not find her license and offered to tell them her information. She then asked the officers the problem and Officer Stanley told Ms. King that the dogs could not run loose in the neighborhood, explaining that they had to be on a leash and it was not the first time they had been loose. Officer Walton then twice asked Ms. King for her first name. Instead of responding to Officer Walton, Ms. King told the person on the other end of the cell phone that the dogs were not supposed to be at large and had supposedly gone onto the neighbor's property.

Officer Walton again asked Ms. King her first name, and this time she responded to Officer Walton. She also responded to his questions about her date of birth, whether she lived in the home and her phone number. Officer Stanley then asked for Ms. King's boyfriend's name

and Ms. King answered Derek R. Officer Stanley followed up by asking who else lived in the home and Ms. King responded that it was Luis C. Officer Stanley asked if Luis C. was the person who had previously gotten the citation for the dogs and Ms. King agreed. Officer Walton then asked Ms. King how to spell her boyfriend's name. Ms. King spelled his first name, then, after a few second pause, asked, "Why?" Officer Walton then asked for the boyfriend's last name, which Ms. King gave. After Officer Walton confirmed the spelling of the name, Ms. King again asked, "Why?"

Officer Walton then abruptly and firmly ordered Ms. King to get off the phone. Ms. King responded "Excuse you?" Officer Walton then said "No, excuse you. Get off your phone, right now." Ms. King refused. Officer Walton then said "Your dogs are running at large, and I'm. . ." Ms. King then cut Officer Walton off mid-sentence, stating "I'm not going to talk to you." As she said this, she started to move quickly toward her home.

As soon as she begin to move, Officer Walton grabbed Ms. King's forearm and at the same time said "Hey, you don't, hey. . ." Ms. King then pulled her forearm away and said in an elevated voice, "Don't touch me, what the fuck are you touching me for?" As she pulled away, she took a few quick steps toward her home.[2] As she moved, Officer Walton said "Hey, come here" and quickly moved to grab her again. As he did, he told her three times to "put your phone down" over her protests. Officer Walton again grabbed Ms. King, and at that, she yelled, "Get the fuck off of me, I didn't do anything." Officer Walton said "I'm asking you for your information, you. . ." Ms. King again yelled over Officer Walton, shouting, "I gave you my

---

[2] At this point on the dascam recording, the view of Officer Walton and Ms. King is almost totally obstructed by foliage outside the home. The court has reconstructed the events where they are mostly off-camera from what can be seen from behind the foliage on the dashcam video, the audio from the dashcam, and the factual submissions offered by the parties.

fucking information." Officer Walton again told her to put the phone down. He then asked Officer Stanley to call another police officer. Ms. King then shouted, "What the fuck, let go, I'm not doing anything, sir. I'm not, what the fuck are you doing?"

At that point, Officer Walton took Ms. King to the ground. Officer Walton testified that he was trying only to put Ms. King off balance and did not intentionally throw her down. Ms. King, on the other hand, recalls that Officer Walton forcefully threw her to the ground. Ms. King does not deny that she was struggling to again break Officer Walton's grip on her arm immediately before he took her to the ground.

Ms. King landed in a prone position with her arms drawn up beneath her and Officer Walton on her back. Once down, she began to scream and exclaim in apparent surprise and pain. Officer Walton testified that Ms. King was continuing to struggle with him after she was on the ground. He asserts that she was flailing her arms and kicking. According to Ms. King, she was tensing up from being thrown down, not intentionally resisting Officer Walton.

After she was on the ground, Officer Walton again told Ms. King to let go of the phone and put her hands behind her back. Officer Walton recalls that Ms. King was still holding the phone after she went to the ground and appeared to still be trying to talk into the phone. Ms. King asserts that the phone flew out of her hand as she went down and that despite this fact, Officer Walton continued to tell her to drop the phone.

Ms. King then asked Officer Walton why he had taken her to the ground. He explained his reasons. After another brief verbal exchange, Officer Walton again told her to put her hands behind her back. He then handcuffed her and called dispatch. At some point, either from the going to the ground or from her movements after that, Ms. King's phone came out of her hands,

both shoes came off her feet, and her elbows were scraped to the point of bleeding. Ms. King recalls Officer Walton putting his knee on her back after she was on the ground.[3]

Officer Walton walked away from Ms. King for a moment, then asked for her age and told her to sit up. Officer Walton and Ms. King then began what can only be described as a prelude to this action, arguing the legal merits of what they had just done and staking out their positions as to why they were in the right. (This debate between the two continued on several occasions afterwards as well.) Officer Walton then pointed out that her arm was bleeding and asked Ms. King whether she needed medical attention, to which she responded, "No, I'm fine." Soon after, Officer Walton instructed Ms. King to walk in front of his car. She did so without any problem, and stood calmly in front of the car. Officer Walton later took photographs of Ms. King's injuries.

Ms. King testified that while she did not immediately seek medical care after the incident, the scrapes on her elbows were later treated by a doctor. She asserts that she now has scars from those injuries. Ms. King also states she suffers from anxiety attacks because of the incident.

---

[3] Officer Walton also includes in the undisputed facts section several opinions asserted by Kenneth R. Wallentine regarding the reasonableness of Officer Walton's actions. Since all of these opinions purport to reach legal conclusions from the facts, the court has disregarded Mr. Wallentine's opinions. *See Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.") On the other hand, Mr. Wallentine's report also contains what can only be viewed as the legal analysis that lead him to his opinions. This analysis is what one would typically expect to see in a legal brief, and it appears that Officer Walton intended to adopt Mr. Wallentine's analysis as his argument on several points. Apparently realizing this, Ms. King responded to much of Mr. Wallentine's analysis in her rebuttal to Officer Walton's fact section. Accordingly, the court will treat Mr. Wallentine's report as further legal argument as to why Officer Walton acted reasonably, but not as proper expert testimony.

Ms. King later pled no contest to charges of interfering with a public servant that were brought against her stemming from the incident. She was sentenced to probation and a small fine.

In March 2009, Ms. King brought suit against Officer Walton. Officer Walton has moved for summary judgment based on qualified immunity and related arguments.

## ANALYSIS

**I. Legal Standards**

    **A. Summary Judgment**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment "bears the initial burden of demonstrating an absence of a genuine issue of material fact." *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002) (citation omitted). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial." *Id.* (citation omitted). "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When "applying this standard, [courts] examine the factual record in the light most favorable to the non-moving party." *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 565 (10th Cir. 2010) (internal quotation marks and citation omitted).

B.      **Qualified Immunity**

"Qualified immunity protect[s] officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).  Officers are entitled to qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow*, 457 U.S. at 818).

To determine whether a defendant is entitled to qualified immunity, a court answers two questions: (1) whether a plaintiff has asserted that the defendant violated a constitutional or statutory right, and (2) "whether that right was clearly established such that a reasonable person in the defendant's position would have known that his conduct violated that right." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1218 (10th Cir. 2008) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1007 (10th Cir. 2003)).  If the plaintiff "fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity." *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003) (internal quotation marks omitted).  The court has discretion as to which of these two inquiries it addresses first.  *See Pearson*, 129 S. Ct. at 818.

II.     **Ms. King Did Not Establish a Constitutional Violation**

Ms. King claims that Officer Walton violated her Fourth Amendment right to be free from excessive force when he grabbed her, took her to the ground and handcuffed her.  The "Fourth Amendment protects the right of individuals to be free from improper arrest and detention," including having police officers use excessive force against them.  *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281, 1288 (10th Cir. 2008).  Officer Walton does not deny that he seized Ms. King when he grabbed her arm and took her to the ground.  The question then

becomes whether Ms. King has shown facts that, taken in the light most favorable to her, would show that he used excessive force in seizing her. As the court explains below, she did not.

Courts have "long recognized" that under the Fourth Amendment, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989). To decide whether the force used is excessive, courts undertake "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Cortez*, 478 F.3d at 1125 (quoting *Graham*, 490 U.S. at 396). Courts look to the totality of the circumstances of each case to determine whether force is excessive, avoiding perfect hindsight and applying an objective standard. *Cortez*, 487 F.3d at 1125. Moreover, an officer's intent or motivation should not be considered to determine if his or her actions were reasonable. *Id.* Further, an inquiry into a use of force must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396).

Because Officer Walton initially grabbed Ms. King's arm during an investigation and he was not making an arrest when he did so, the court will analyze this as a *Terry* stop situation. The Tenth Circuit has "recognized that, given evidence of officer safety concerns, officers may in appropriate circumstances take steps to protect their personal safety and maintain the status quo during a *Terry* stop." *Cortez*, 478 F.3d at 1130 (citing *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030-31 (10th Cir.1997) and *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)). The *Cortez* court explained that:

> officers may in appropriate circumstances take steps to protect their personal safety and maintain the status quo during a *Terry* stop. Although *Terry* stops are normally nonintrusive, we have indicated that law enforcement may (1) display some force, (2) place suspects on the ground, (3) use handcuffs, or (4) detain suspects in law enforcement vehicles, even in the absence of probable cause.

*Cortez*, 478 F.3d at 1130 (citation omitted).

Under these standards, even taking the facts in the light most favorable to the Ms. King, the force Officer Walton used against her was reasonable. The court will break the force into two parts. First, it will analyze Officer Walton's initial arm grab, which was not particularly forceful and was easily broken by Ms. King. Second, it will consider the second arm grab, struggle, take down, and handcuffing of Ms. King, which involved progressively more force.

When Officer Walton initially grabbed Ms. King's arm, it was reasonable to do so to maintain the status quo of his investigative detention of her. Though he had not previously given her a clear instruction that she had to stay to finish answering his questions, it was reasonably clear from the situation that he was still investigating and had more questions for her. Ms. King admitted that she knew that he intended to continue speaking to her when she started to walk off. Moreover, Officer Walton had no time to tell her that she needed to stay, since she started to move without warning. While it is true that there is a difference between saying "hey" and saying "please stay here," it was clear that Officer Walton wanted Ms. King to stay for more questions. Officer Walton cannot be faulted for not immediately thinking up the optimal words. Given these facts, his minimal use of force in grabbing for her arm was commensurate with its intended goal of keeping her from walking off.

Further, Officer Walton could not have been sure what Ms. King intended when she began bolting toward her home, giving rise to a reasonable a concern for safety. The facts show that Officer Walton knew that there were two apparently dangerous dogs in or around the home.

-10-

He also knew that there might be a man in the home who had recently been arrested. It was only after Officer Walton asked about Ms. King's boyfriend that she started to question the investigation, responded in a combative tone, and then headed toward her home. A reasonable officer could have suspected that the boyfriend was in the home and had told her on the phone to break off the investigation if the officers did not answer his questions. Though Officer Walton had not been wary of Ms. King entering the house when he first arrived, subsequent events allowed him to reasonably reassess that judgment. Even if the safety concerns may have been minor and somewhat vague, Officer Walton's initial grab was not especially strong. Under these circumstances, then, it was reasonable for Officer Walton to make the split second decision to try to stop her with the minimal force of grabbing for her arm, both to maintain the status quo and for safety.

In perfect hindsight, it seems clear that Ms. King was walking away because she was annoyed by what she perceived as Officer Walton's rudeness. She also thought she that she had been cooperating fully. The court, moreover, is not convinced that Officer Walton's forceful order for her to get off the phone was necessarily the most professional or the most reasonable way to respond right after she appeared to question him. A reasonable person could suspect that Officer Walton changed his tone and gave the order because his authority was being challenged. From this perspective, one could see why Ms. King might have been uncomfortable with further questions from him. Ms. King certainly sees Officer Walton as the provocateur in the situation.

But Ms. King does not prevail even if the court assumes that Officer Walton was simply being a bully and should not have told Ms. King to get off the phone. Even if Officer Walton's order was improper and impolite, it was still reasonable for him to use minimal force to try to stop her from leaving under all the circumstances. First, it was obvious that Officer Walton

-11-

intended to continue the investigation. Moreover, a reasonable officer could not be expected to immediately and accurately determine Ms. King's reasons for starting to leave in the face of his order. First, his order, even if rude, was not threatening or abusive. Further, he was not in a situation, where, for example, he had simply bumped into Ms. King on the street and told her to get off the phone. In those circumstances, a reasonable officer could be expected to realize that it was his abrupt command that triggered her to want to walk away. But those are not the facts Officer Walton was facing. Rather, among other facts, Officer Walton had gone to Ms. King's home to respond to an emergency call involving potentially dangerous dogs. He had heard Ms. King admit to owning the dogs that were allegedly roaming off leash. He had also seen her seem to become suspicious when the subject of the investigation became her boyfriend, who she also admitted owned the dogs. Even if his order was uncalled for, he could not reasonably be expected to give Ms. King the benefit of the doubt when she responded in a combative way and started to quickly walk off.

Moreover, the interview had already been hindered by Ms. King talking on the phone. Officer Walton also stated that he suspected that the person on the other end of the line was prompting her, which was a reasonable supposition. Even if the interview had, for the most part, been routine and cordial up to that point, Officer Walton was not required to wait for the possible prompting to again interfere. While these facts support a finding that Officer Walton's abrupt order to get off the phone was justified, then, as just mentioned, his force was reasonable even if the a fact finder were to conclude that the order was improper.

The second grab, take down, and handcuffing were also reasonable. After Officer Walton first grabbed her, Ms. King immediately broke his grip, started to scream obscenities,[4] and quickly stepped toward her home. In the face of this rapidly deteriorating situation, it was reasonable for Officer Walton to grab her more forcefully than he had initially to make sure she did not get loose again.

Once in his grasp, Ms. King again resisted, both physically and by yelling at him. In response Ms. King's continuing resistance, it was reasonable for Officer Walton to use increased force to try to gain complete control over her and end the struggle. Because it caused Ms. King only minor physical harm (aside from some elbow scrapes that have apparently left scars), there is no reasonable basis to conclude that the take down was especially violent or unnecessarily forceful. *See, e.g.*, *Berglund v. Pottawatomie Cty. Bd. of Cty. Com'rs*, 350 Fed. Appx. 265, 271 (10th Cir. 2009) ("The extent of the injury inflicted by any use of force is additionally relevant in evaluating an excessive force claim.") (unpublished opinion, citation omitted).[5] Supporting this conclusion are the undisputed facts that Ms. King initially declined medical treatment, that she

---

[4] Ms. King points out that the neighbor had sworn when he spoke to the officers, suggesting that Officer Walton should have thus discounted Ms. King's curse words. Of course, the context of the words defeats this argument. The neighbor's crude language was conversational, while Ms. King's cursing was accusatory and increased the tension in an already volatile situation.

[5] Officer Walton argues that because Ms. King's physical injuries were *de minimis* in nature, her claim of excessive force fails as a matter of law. Ms. King correctly responds that the Tenth Circuit only applies the "actual injury" rule to cases where the "excessive force claim relies upon unduly tight handcuffing." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1208 (10th Cir. 2008). In excessive force cases not related to handcuffing, the Tenth Circuit has "consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury." *Id.* (citation omitted). Here, Ms. King does not claim that Officer Walton applied the handcuffs too tightly. The minimal nature of the physical harm to Ms. King therefore does not bar her claim. As is clear from the discussion above, however, the extent of her injuries is a fact to that may be considered when assessing whether she has shown excessive force was used.

was quickly and cogently arguing her case while still on the ground, and had little problem walking even in handcuffs after she was lifted off the ground. Even if the phone flew from her hands and her shoes were knocked from her feet from the take down, those facts do not support a conclusion that the force was excessive here. It is easy to lose one's grasp on a phone, and shoes can be loose fitting, loosely laced, and so on. Had Ms. King presented evidence suggesting extreme force in the take down, such as a dislocated joint, a broken bone, a concussion, and so on, she would have had a more reasonable basis to say that the take down was excessive.

Finally, once she was on the ground, a reasonable officer could have perceived Ms. King as continuing to struggle. Whether or not Ms. King was still on the phone, it was reasonable to handcuff her to finally end any more struggling. Even assuming Officer Walton briefly placed his knee in Ms. King's back to facilitate the handcuffing, there is no evidence that his doing so was excessive taking all of the circumstances into account.

For the reasons set forth above, Ms. King has not established facts that, even when viewed most favorably to her, support a finding that Officer Walton used excessive force here. Accordingly, Officer Walton is entitled to qualified immunity. *See Smith*, 339 F.3d at 1211 (qualified immunity must be granted if plaintiff does not show a violation of a constitutional right).

Given Ms. King's failure on the this part of the qualified immunity inquiry, it is not necessary to determine whether Ms. King's rights in this situation were clearly established. On that subject, however, the court notes that Ms. King would have had difficulty showing that Officer Walton crossed a clear line here given all of the circumstances. Though the generalized right to be free from excessive force is undeniably well established, cases like *Cortez* permit the use of some force in accomplishing a *Terry* stop. Ms. King did not offer any case in which a

court has concluded that an officer violated a person's constitutional right by lightly grabbing a person's arm when the person was quickly walking away from an ongoing interview. Nor has Ms. King cited any case in which a quick and forceful take down that resulted in minimal injury was found to be excessive force when the individual taken down was pulling away and yelling at the officer. Nor has Ms. King cited cases in which excessive force was found under similar fact patterns. Rather, Ms. King relies on a generalized analysis. While the court need not reach this prong, Ms. King's case likely failed on this ground as well.

## ORDER

For the reasons set forth above:

Officer Walton's motion for summary judgment (Dkt. No. 25) is GRANTED. The parties shall bear their own costs and fees in this action.

SO ORDERED this 11th day of May 2011.

> BY THE COURT:
>
> _____
> Clark Waddoups
> United States District Judge